```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION

SANTIAGO PINEDA, all others)
similarly situated under   )
29 U.S.C. 216(b), and       )
MARIA PENA,                 )
                            )
          Plaintiffs,       )
                            )
vs.                         )3:13-CV-00588-B
                            )
JTCH APARTMENTS, LLC        )
and SIMONA VIZIREANU,       )
                            )
          Defendants.       )
```

                        MOTION HEARING
            BEFORE THE HONORABLE JANE J. BOYLE
                UNITED STATES DISTRICT JUDGE
                    FEBRUARY 19, 2016

                    A P P E A R A N C E S
For the Plaintiffs:

```
      JH ZIDELL, PC
      6310 LBJ Freeway - Suite 112
      Dallas, TX  75240
      (972)386-7610
      BY:  ROBERT LEE MANTEUFFEL
           JOSHUA AARON PETERSEN
```

For the Defendant:

```
      THE KING-MAYS FIRM
      1122 North Bishop Avenue - Suite E
      Dallas, TX  75208
      (213)942-1762
      BY:  NADINE R. KING-MAYS
```

```
COURT REPORTER:   SHAWNIE ARCHULETA, TX CCR No. 7533
                  1100 Commerce Street
                  Dallas, Texas 75242
```

proceedings reported by mechanical stenography,
transcript produced by computer.

1          (In open court at 10:04 a.m.)

2          THE COURT:  Good morning.  For the record,

3     this is Civil Action 3:13-CV-588, Santiago Pineda

4     and Maria Pena v. JTCH Apartments and Simona

5     Vizireanu.

6          We are here this morning over an issue

7     with regard to the supersedeas bond.  The specific

8     reason the Court set this was triggered by a couple

9     of events, which include the plaintiffs' motion for

10    clarification regarding the Court's order, Document

11    125 and in February 9 of 2016, which granted the

12    motion to stay filed November the 24th.

13         Let's begin this discussion by having the

14    parties introduce themselves, starting with counsel

15    for the plaintiffs.

16         MR. MANTEUFFEL:  Robert Manteuffel for

17    plaintiffs here today, with Joshua Petersen.

18         MS. KING-MAYS:  Nadine King-Mays with JTCH

19    and Simona Vizireanu.

20         THE COURT:  The purpose of this is two or

21    three-fold.  I understand that perhaps the motion

22    for clarification may not be ripe for decision or it

23    may be moot at this point, given, as I understand

24    it, the dismissal of the garnishment action that was

25    filed, but I want to hear from both sides on this.

1          I did tell the parties, through whoever

2  called when they were asking if the hearing would go

3  forward, that it was going forward, because I have a

4  number of concerns about events in this case.  And

5  let me just start by giving you all those concerns,

6  and then I want to hear a little bit from you on a

7  couple of different topics.

8          This case, of course, was tried last year.

9  The plaintiffs prevailed and were awarded a certain

10  amount, 1,400-something dollars damages and then

11  later liquidated damages and a little more than that

12  and then estimated 70,000-plus in attorney's fees.

13          The case was appealed and a motion to stay

14  the judgment was filed November the 24th.  While

15  that motion was pending, which was opposed by

16  plaintiffs' counsel, a garnishment action was filed

17  separately, as it has to be.  And my office received

18  a message on our message machine from Ms. King-Mays

19  that her client's accounts had been garnished for

20  double, perhaps, what they were worth, something to

21  that nature.  It was a panicked phone call, and it

22  caused the Court a great deal of concern given that

23  the Court had not ruled on the motion to stay.  And

24  if it was that urgent, perhaps somebody could have

25  called.  I'm not saying it was right to wait for it

1    that long, but in any event it was pending,

2    nonetheless.  And I find out there's a garnishment

3    action and Ms. King-Mays' client's accounts had been

4    basically frozen, something to that nature.  So it

5    seemed to me appropriate to go ahead and do

6    something with the pending motion, which I went

7    ahead and granted motion to stay.  Then I received a

8    motion for clarification.

9            So that's part of why we are here.  The

10   other concern I have is, besides the going and

11   filing of an action that essentially collided with

12   the proceedings in this case, given that it was a

13   pending motion to stay, is how it is that this

14   garnishment action operated so quickly.  It sounds

15   as soon as the case was filed and the bank was

16   served that the accounts were shut down, and I'm not

17   even sure from Ms. King-Mays or from anything she's

18   filed whether or not they had even gotten notice of

19   it and how that time frame worked so quickly and so

20   prejudicially toward what it appears to be toward

21   Ms. King-Mays' client.

22           So with all of that, I'm going to start

23   with you, Mr. Manteuffel, because I am concerned

24   about what happened here and I don't want to see

25   that happen in the future.  Maybe I have missed some

1   facts and you can help us out.

2          MR. MANTEUFFEL:  May it please the Court.

3   The motion to stay was filed November the 24th, and

4   we filed our response duly 21 days thereafter.  No

5   reply was ever find.  No bond was ever filed.

6   There's was no indication that a bond had, in fact,

7   been procured.  We waited for days after that and,

8   in fact, more than 30 days after that.

9          THE COURT:  What legal right does 30 days

10  waiting give you for a pending motion to proceed on

11  action that is sought to be stayed in a pending

12  motion?  Where does the 30 days somehow exculpate

13  you?

14          MR. MANTEUFFEL:  To us it was a reasonable

15  period of time to allow the defendants to come

16  forward with their bond.  They said that 30 days

17  after they filed their motion that they would know

18  and could post a bond in the amount that they had

19  requested of 91,000-and-some dollars.  Nothing was

20  done.

21          The case from the inception is it's been

22  very difficult to get the defendants to move absent

23  some extraordinary circumstance.  We waited 30 days

24  even after that.  And then in a collection action,

25  it is always very difficult, especially garnishment.

 1   Because if you give notice to the other side, there

 2   is a chance the accounts will be emptied and then

 3   your client loses any potential security.

 4          And the affidavit of Ms. Vizireau attached

 5   to the original motion sets out that they have no

 6   assets capable of answering that.  They are applying

 7   for a loan, I understand that, but I had to take

 8   some action to try to protect my clients' interests.

 9          The speed of the garnishment is in effect,

10   I believe, of the fact that when a garnishment is

11   filed, we are required to use a peace officer to

12   serve it.  And a constable out of Precinct 1 did, in

13   fact, serve it on CT Corporation, who is the

14   registered agent for the bank.  And I have to serve

15   the registered agent for the bank, that's the only

16   way the garnishment will be effective.

17          Once the bank receives through CT

18   Corporation notice of the garnishment, I am under

19   the impression that the bank freezes the funds at

20   that time.  No one from the bank contacted me.  They

21   would answer the lawsuit within 21 days is what

22   normally would happen.

23          Ms. Vizireau did get notice, I believe,

24   probably the next day after it was served on the

25   bank, because she did call me in my office, and the

1   only counsel I could give her was to contact her

2   lawyer and go through it with Ms. King-Mays because

3   I wasn't in a position, really, to give her any sort

4   of counsel or discussion on the issue since she's

5   represented by counsel.  So I'm in that box as well.

6            Subsequent to that, I know the Court

7   contacted us.  We did not hear anything from the

8   bank, which is not unusual because they have to

9   assign it to a lawyer and then get in touch with us

10  when they file their answer.

11           Based upon a garnishment that we had with

12  Bank of America some period of time ago, probably

13  over a year, I knew they had a lawyer in Houston who

14  handled these matters.  He had changed firms.  We

15  did find him and provided his information back to

16  the Court.

17           THE COURT:  I wanted someone from the bank

18  to explain to me how it is that they immediately

19  froze those accounts.  What's the legal process,

20  what's the rules, what's the protocols for doing

21  that when, in fact, it sounds as though it perhaps

22  was a bit unorthodox.  I don't know.  I'm trying to

23  find out if that's the way you operate, if that's

24  the way you think it should operate, and then we

25  need to figure out how we can prevent that from

1  happening in the future.

2          MR. MANTEUFFEL:  The procedure is, in

3  fact, that when the bank serves notice of

4  garnishment the bank will secure funds to satisfy

5  the garnishment.  The garnishment we applied for was

6  only the amount of the judgment, which is about

7  92,000-and-some, off the top of my head.  We never

8  made application for anything in excess of the

9  judgment, and I cannot garnish in excess of the

10  judgment, that would be illegal.  Why the bank froze

11  180-some-odd-thousand, I have no idea.  They did not

12  share that with me.

13          THE COURT:  Mr. Manteuffel, there is a

14  case that you were involved in.  Judge Toliver wrote

15  an opinion.  It was an FLSA case, Pedro Garcia

16  Arriaga v. Jess Enterprises where, once again, you

17  were called to answer for what Judge Toliver found,

18  at least in part, was a flawed garnishment process.

19  And the notice wasn't -- was patently untimely.  And

20  so this isn't the first time you have been called

21  out for a garnishment conduct that appeared

22  unorthodox to the Court or unsavory.

23          MR. MANTEUFFEL:  In Judge Toliver's case,

24  what we did not get out in time was the return from

25  the peace officer.  In fact, I didn't get the return

1  from the peace officer in this case until about a

2  week after it was served.  Once we have the actual

3  return, then we are required to serve it on the

4  judgment debtors, which would be the defendants in

5  the underlying case within 21 days.  In that

6  particular case, I was in trial, I had a new

7  associate, we did not get it out.  There is not a

8  specific time frame set in the rule, but we would

9  have had that period of time.

10          THE COURT:  She said it was patently

11  untimely.

12          MR. MANTEUFFEL:  Right, because it was

13  more than 21 days.

14          THE COURT:  And dissolved the writ.

15          MR. MANTEUFFEL:  Yes, that's correct,

16  because it was more than 21 days after we had --

17  after the writ had been served.  But I have to have

18  the return from the constable in order to make that

19  filing.

20          THE COURT:  Let's back up a minute.  Did

21  you have any qualms about filing this garnishment

22  action when the Court hadn't ruled upon the motion

23  to stay the judgment?

24          MR. MANTEUFFEL:  I thought about it for an

25  extra 30 days.  That's why I took the extra time.  I

 1  gave Ms. King-Mays --

 2           THE COURT:  You've already told me that.

 3           Did you have any reservations and think

 4  perhaps it might have been appropriate to notify the

 5  Court, file an expedited motion, at least call and

 6  ask for a hearing on the motion or something of that

 7  nature to figure out if it was appropriate to file a

 8  whole separate action?

 9           MR. MANTEUFFEL:  Since I represent my

10  client and have to protect their interests, Your

11  Honor, I have to set my qualms aside and try to do

12  the best I can.

13           THE COURT:  Mr. Manteuffel, this is

14  outrageous, I think, that you handled this action in

15  this way.  And I'm concerned about some of the

16  tactics I've seen from you in some of these cases.

17           The last trial that we had, the woman who

18  was your plaintiff who was the witness against these

19  two businessmen took them two, two and a half, three

20  years to go through a case that was based upon

21  falsities, lies.  She wasn't telling the truth.  I

22  don't think the jury believed she was telling the

23  truth.  And I certainly, as I mentioned during the

24  hearing, didn't think she was telling the truth.

25           And then within a few weeks after the

1    holidays, I get this emergency call from

2    Ms. King-Mays that you've gone ahead and filed a

3    separate action and garnished her clients' accounts,

4    which, however you try, I haven't heard anything yet

5    that justifies yet what you did in my view.

6              It's of concern to me.  I don't want to

7    see this happening again, and I hope it doesn't

8    happen anywhere else in the courtroom again.  Do you

9    understand -- I'm giving you an opportunity to cite

10   me to a rule or a process or something that

11   justified you going ahead and filing a separate

12   garnishment action when the issue of whether or not

13   you could do such was still pending in this court.

14             MR. MANTEUFFEL:  I do not believe that the

15   filing of a motion requesting a stay stays the

16   execution, Your Honor.  The only thing that would

17   stay execution would be the posting of the bond,

18   itself, and that is under the rules of the State of

19   Texas for garnishment.

20             THE COURT:  Your briefing says the rules

21   of the State of Texas don't apply.

22             MR. MANTEUFFEL:  With regard to setting

23   the amount of the bond, that's correct.

24             THE COURT:  So if you will answer my

25   question.

1          MR. MANTEUFFEL:  I believe that the

2     granting -- the filing of the motion does not in and

3     of itself stay execution.

4          THE COURT:  When you filed the garnishment

5     action, did you note in any of your filings that

6     there was this separate related case?

7          MR. MANTEUFFEL:  In the cover sheet for

8     the filing, yes, Your Honor.

9          THE COURT:  All right.  Is there anything

10    else that you can tell me to justify what happened

11    here?

12         MR. MANTEUFFEL:  I believe that I had to

13    do that to protect the interests of my clients in

14    light of the fact that every filing I had indicated

15    that these defendants did not have assets sufficient

16    to answer the judgment.

17         THE COURT:  Mr. Manteuffel, I'm just going

18    to tell you right now that you can take that

19    position perhaps if another court agrees with you,

20    but I don't.  If this comes up again, you are on

21    record in this court for having what I think engaged

22    in a questionable practice with regard to getting

23    your money, the majority of which you will concede

24    is attorney's fees.

25         I want to hear from Ms. King-Mays, and

1   then I want to hear back from you if you have

2   anything else to say.  But we're here today because

3   I have serious misgivings about your conduct and the

4   way you handled this case.

5           Ms. King-Mays, come on up.  I saw your

6   response.  I want to hear -- you've heard what

7   Mr. Manteuffel has to say, and I would like to hear

8   your response.

9           MS. KING-MAYS:  Your Honor, our concern

10  with what happened in this case was based upon the

11  fact that Mr. Manteuffel, throughout the course of

12  the litigation, understood that this particular

13  piece of property is the property that my client

14  purchased basically from their retirement.  Her

15  husband is incapacitated.  This is the only way that

16  they make money.  This is it.

17          Her husband, as I indicated, he's on

18  Medicare.  There's a Medicare set aside account for

19  him, which this particular garnishment action hit

20  and basically took out $182,000 from a

21  110,000-dollar account which is supposed to be

22  federally protected.

23          I contacted Mr. Manteuffel and I explained

24  to him that the amount hit that account and asked

25  specifically, you know, to release the bond --

 1   release the garnishment because of that, because

 2   they have to report to the federal government about

 3   the money disappearing from that account.  But he

 4   indicated the garnishment will go forward.

 5              My concern also is this --

 6              THE COURT:  So he gave you no

 7   consideration about the fact that this was this

 8   Medicare account.

 9              MS. KING-MAYS:  No.  He just said, the

10   garnishment will go forward.  I attached that in my

11   response.

12              The concept that he says that the rules of

13   Texas do not apply in this instance regarding

14   setting of the bond runs completely counter to the

15   brief that they filed where they indicated they

16   should get twice the amount of the judgment basing

17   that on some, you know, obscure notion that used to

18   exist in Texas law where you would get twice the

19   bond, but that was usually in eviction cases.  But

20   it's not the case in the way that bond is determined

21   in Texas courts.  In Texas courts, in fact, it

22   doesn't even include attorney's fees.  The bond is

23   only based on the judgment itself.

24              So my concern was, if you want to go the

25   Texas route, then let's go the Texas route.  If we

1   are going to go the federal court route, let's go

2   the federal court route, which was the judgment, the

3   fees, costs, 20 percent for delay and $250.  This is

4   what we offered for the bond; they opposed it.

5          This is the reason that we were waiting.

6   If they had said, great, the amount is fine, we

7   could have gone out -- we had the money sitting at

8   the bond company.  We had the name of the bond

9   company in our documents.  If they had any questions

10  regarding whether or not this was a collateralized

11  bond, which it was, we would have told them, yes,

12  this is collateralized; this is cash that's securing

13  this bond.  They never asked.  Not once did they

14  ask, because I don't think that that was the point

15  in this.  I think the point was to try to basically

16  nail us to the wall.  Because understand, if they

17  had said at the beginning, okay, $93,000, that

18  sounds like a sufficient bond, the bond would have

19  been done as we had it in this instance done in

20  three days.  There was -- it was there, it was

21  ready.  We would have done it.

22          But I think the whole point of objecting

23  to the amount of the bond was to do this, was to

24  actually have the garnishment.  Because there's of

25  course this knowledge that a garnishment action in

1   Texas court does not have to wait for the

2   determination from the Court on the supersedeas

3   bond.  If they have the judgment, they can just run

4   out and start placing these garnishment actions all

5   around.  But that's only if they do not believe that

6   there is any money, any property in the state that

7   they can actually get their judgment from.

8            The statement that we had the bond at the

9   Great American Insurance Company, they were just

10  waiting on the amount.  That was all we were waiting

11  for and the form of the bond to be approved.  And

12  then to have Mr. Pineda sign an affidavit that,

13  based on his knowledge acquired while he was an

14  employee at the apartment complex -- where he is a

15  maintenance man, has no contact whatsoever with the

16  books, finances, property, nothing -- why would he

17  have an affidavit saying that based on his

18  information as an employee, he believed that they

19  didn't have the property.

20           This is not a client argument.  This is an

21  attorney's argument.  This was an attorney action.

22  I don't believe that if Mr. Manteuffel had told

23  Mr. Pineda, okay, a significant portion of this is

24  our fees and our costs.  We think that they can

25  probably afford to pay you, they just can't afford

1  to pay us, I don't think he would have signed that

2  document.  I don't even know if he understood what

3  he signed.  And signing something like that under

4  penalty of perjury I think is very dicey to do to a

5  client.

6        But our position is that we had no problem

7  paying the bond.  She borrowed the money to get the

8  bond so that this thing that happened would not

9  happen.  Of course the problem was that 182,000,

10  which is twice the amount of the judgment, was taken

11  out of every account so it ended up being $546,000

12  being held.

13        THE COURT:  Did you tell Mr. Manteuffel

14  this?

15        MS. KING-MAYS:  Yes, but the garnishment

16  would proceed.

17        THE COURT:  I'm sorry?

18        MS. KING-MAYS:  But that they were going

19  to proceed with the garnishment.

20        And again, I understand having to make

21  sure that the judgment is going to be paid.  That's

22  why we said we would pay the bond so we would make

23  certain that everybody is fine, we move forward with

24  the appeal with nothing like this happening to

25  anyone.

1          Again, my client, you know, she's in

2   California.  She doesn't even live here.  You know,

3   when she went to the bank and saw all their money

4   gone, her husband's account affected -- and he's

5   very, very precarious in his health, and she is too,

6   she almost had a heart attack, you know.  So we are

7   just concerned that something like this happens when

8   we were all too willing to put the bond up, and I

9   don't understand.

10          THE COURT:  So her account is frozen for

11   upwards of $500,000 over a judgment in the

12   plaintiffs' favor of $1,426 and 3,775.50 and then

13   the larger amount of attorney's fees, that shut down

14   her accounts.

15          MS. KING-MAYS:  Yes.

16          THE COURT:  Now, did you call the bank and

17   find out what the heck was going on?

18          MS. KING-MAYS:  They would not speak to

19   me.

20          THE COURT:  They wouldn't speak to you.

21          MS. KING-MAYS:  No.  In fact --

22          THE COURT:  Did you ask Mr. Manteuffel for

23   a contact name or anything?

24          MS. KING-MAYS:  I called -- in order, my

25   client called the bank.  When she called the bank,

1    they sent her a letter telling her that she had to

2    call this number.  The number she called was

3    actually Mr. Manteuffel.  She thought it was the

4    bank down here, but it was Mr. Manteuffel.  He told

5    her to contact me.  She contacted me.  I said, get

6    me your bank officer.  The bank officer, however,

7    said that the legal department would only speak to

8    Mr. Manteuffel.  So we --

9              THE COURT:  Did you tell Mr. Manteuffel

10   that?

11             MS. KING-MAYS:  I don't know if I told him

12   that they would only speak to him or not, but I did

13   contact him and ask him, you know, to release --

14   because they said they would not take a release from

15   us, it had to be from him.  So that's why I asked

16   him to release the garnishment, and they indicated

17   that they were going to proceed with it.

18             THE COURT:  So far as the actual series of

19   events, once the action was filed and served on the

20   bank, do you take issue at all with the manner in

21   which the bank proceeded in terms of notice to your

22   client or a chance for you to be served and all of

23   that, because this isn't something that comes up in

24   this court very often and there's a wide mix of

25   rules and regulations that apply to this, and I

1    wanted to hear from you on that.

2         MS. KING-MAYS:  Well, our concern is that

3    we didn't know anything about this until after

4    everything had happened.  I called Mr. Manteuffel

5    and asked them to please give me a copy, whatever it

6    is that happened, because there's nothing in the

7    file.  And then that's when we realized it was a

8    separate garnishment action.  They sent that to me,

9    I believe, on the 9th or the 10th.

10        THE COURT:  And so of course you would not

11   have been notified because you were not a party to

12   that.

13        MS. KING-MAYS:  Exactly.  I know there are

14   rules regarding when it is that the individual who

15   has been -- the third party, who the garnishee is

16   related to, the judgment debtor, the timing that

17   they have to be informed.  But under the

18   circumstances, since we had an ongoing motion

19   regarding this issue, I would have expected

20   Mr. Manteuffel to call me and say, you know what, I

21   don't think that you have the money and I think that

22   you are stalling.

23        THE COURT:  And you never reached -- what

24   I'm hearing you say is there was never actually an

25   impasse reached with regard to your back-and-forth

1   with him on the bond in this case?

2          MS. KING-MAYS:  No.  We never discussed

3   it.  We just filed the motion; they filed the

4   response.  They never called and said, I don't

5   believe that you really have the money, show us what

6   you've got.  We would have showed it to them and

7   said, no, it's right here, and they could have

8   called the insurance company and told them, it's

9   right here.

10         My position is, since the amount that they

11  garnished was from Mr. Manteuffel's statement, the

12  amount of the judgment -- there was more the amount

13  of judgment that we had offered in order to bond.

14  So why not say yes to that amount instead of saying,

15  no, you have to pay us twice that, you have to bond

16  twice the amount.  That's what doesn't make sense to

17  me.  So you have to bond twice the amount but then

18  turn around and garnish the amount of the judgment,

19  which we had already offered.  That doesn't make

20  sense.

21         THE COURT:  Backing up a minute, then.  In

22  your experience, do you take issue with any of the

23  procedures taken by the bank in this case in going

24  forward with the garnishment as they did?

25         MS. KING-MAYS:  My concern is not as much

1   with the bank's actions as they are with

2   Mr. Manteuffel's, because he knows my phone number

3   and I know his.  If he thought that there was a

4   problem, he thought he had waited too long, for him

5   to say, you don't have the money.  There is an

6   apartment complex there.  The reality is, even if

7   they wanted to, they could have sold the apartment

8   complex, took their money and just threw the change

9   back at her if they wanted to.  This is what the

10  rights were, which is why we filed the supersedeas

11  bond to keep something like that from that

12  happening.

13          THE COURT:  I guess I'm still not

14  100 percent clear.  The bank would not give your

15  client or you contact information for the bank?

16          MS. KING-MAYS:  No.  No.

17          THE COURT:  Do you remember who you talked

18  to?

19          MS. KING-MAYS:  The only person I asked

20  was Mr. Manteuffel, and he gave me the name of the

21  attorney in Houston.

22          THE COURT:  When was that?

23          MS. KING-MAYS:  That was, I guess, on the

24  10th.  And then, you know, we were already rolling

25  into action.  By the time we got the order on the

1    9th, the assurance company had done the bond on the

2    10th, sent it to California on the 11th and

3    overnighted it to me to come to court on the 12th.

4             THE COURT:  Did you talk to the lawyer in

5    Houston?

6             MS. KING-MAYS:  Yes.

7             THE COURT:  What did you say to him?

8             MS. KING-MAYS:  I spoke to him and told

9    him, this thing has gone insane.  You have garnished

10   six times the amount of the judgment.  And he didn't

11   know that that had happened and that should not have

12   happened, but he would check into it right away.

13   And once he said he would check into it right away

14   was -- that was all there was, because after that we

15   got the judgment -- excuse me.  We got the bond

16   filed, we sent it out to everyone.  Of course it was

17   Friday before the holiday on the Monday, so we

18   didn't start getting anything rolling actually until

19   the Tuesday.  But even now she is scrambling trying

20   to make payments -- cover these payments for

21   everything that bounced when the account was frozen.

22            THE COURT:  The status is right now

23   everything is back to normal?

24            MS. KING-MAYS:  As of yesterday.

25            THE COURT:  As of just yesterday.

1          MS. KING-MAYS:  Yes.

2          THE COURT:  So how long were the accounts

3     frozen.

4          MS. KING-MAYS:  They were frozen beginning

5     on the 8th.  And they were just unfrozen yesterday,

6     but they are still -- the payments and things are

7     still bouncing back from that, and now she's

8     incurring the fees.

9          THE COURT:  Okay.  Ms. King-Mays, is there

10    anything else you would like to say?

11         MS. KING-MAYS:  No, Your Honor.  Our

12    position is we're just trying to move forward.  We

13    are just trying to move forward on this with the

14    least amount of consternation, and this has caused a

15    lot.

16         THE COURT:  Thank you.

17         Mr. Manteuffel, anything else you would

18    like to say?

19         MR. MANTEUFFEL:  In the first instance, as

20    for our client's affidavit, what we speak about with

21    our client of course is privileged.  But the

22    affidavit of the defendants indicates that they

23    don't have sufficient property to answer the

24    judgment in the state of Texas.  If Ms. King-Mays

25    had the funds and the bonding available based upon

1   the motion she filed, I would have expected to see

2   the reply, inform us and the Court of that within

3   the timely filing period.

4           THE COURT:  You would have expected, but

5   there was never a final impasse as I understand it.

6   There was some ongoing negotiations, and you-all

7   just sort of left it.  Is that pretty much what

8   happened?  There was never a final impasse as to,

9   this is not going to be what you need,

10  Mr. Manteuffel, from their end?

11          MR. MANTEUFFEL:  No.  That's a correct

12  statement of fact, Your Honor.

13          With regard to the bank, I did, in fact,

14  talk to the bank's lawyer immediately after I was

15  able to locate him when the Court asked me to do

16  that --

17          THE COURT:  You had already given that

18  name to Ms. King-Mays.

19          MR. MANTEUFFEL:  This was actually before

20  that.

21          THE COURT:  Okay.

22          MR. MANTEUFFEL:  -- and told him that the

23  garnishment was only for the amount of the judgment,

24  90-some-thousand dollars, and there was no reason in

25  the world to keep any money in excess of that.  I

```
 1   think that was probably on the 9th.
 2              THE COURT:  What did he say?
 3              MR. MANTEUFFEL:  He understood that, and I
 4   had no further conversation with him on that issue.
 5              THE COURT:  Did you ask him to fix the
 6   situation?
 7              MR. MANTEUFFEL:  I told him I didn't want
 8   anymore held than that, yes, Your Honor.  The
 9   conversations about holding $500,000, that's news to
10   me.  I don't remember having those with
11   Ms. King-Mays.
12              THE COURT:  Do you dispute that?  Do you
13   say she's wrong?
14              MR. MANTEUFFEL:  I dispute the fact that
15   all of those conversations took place.
16              THE COURT:  Do you dispute the fact that
17   it was 500,000-plus in accounts that were frozen?
18              MR. MANTEUFFEL:  I have no idea.
19              THE COURT:  So you dispute it.
20              MR. MANTEUFFEL:  I don't know to dispute
21   it not.
22              THE COURT:  Ms. King-Mays, he doesn't
23   agree that you had 500,000-plus that was frozen.
24              MS. KING-MAYS:  In the response, I
25   attached -- our response for today, I attached the
```

1   bank statements showing 182,000 that was frozen in

2   three different accounts, which is $546,000.

3          MR. MANTEUFFEL:  I have no reason to

4   dispute that.

5          THE COURT:  Pardon?

6          MR. MANTEUFFEL:  I don't have any facts to

7   dispute that with, so I have no reason to dispute

8   that.

9          THE COURT:  Did you see her response?

10         MR. MANTEUFFEL:  Yes, I did.  I have no

11  reason to dispute that, and I did not ask for that

12  amount of money to be garnished at all, ever.

13         THE COURT:  Mr. Manteuffel, I just need to

14  hear from you that you understand that this was not

15  the proper way to proceed in this particular case

16  under these circumstances.

17         MR. MANTEUFFEL:  I do acknowledge that,

18  Your Honor, and I understand that.

19         THE COURT:  Okay.  Whether or not you have

20  full authority to go freeze accounts when there's no

21  stay is the law as I understand it, and I don't

22  dispute that.  Nonetheless, that's not your panacea

23  here.

24         The problem here is, you were in

25  negotiations with counsel that never really reached

1    an impasse.  And then you go out and freeze these

2    accounts in a way that was extremely -- created

3    extreme hardships on her clients -- and you can't

4    deny that and I haven't heard you do that yet --

5    which apparently has caused her to bounce checks and

6    whatnot, just now got the situation unfrozen.  And

7    to do this to her and to do this to her client when

8    this was ongoing without any involvement of the

9    Court whatsoever to me is just unprofessional.  It's

10   not honorable.

11        However, whatever rules and laws you want

12   to say allows you to do this, I will tell you that

13   it's not professional.  It's not honorable.  It was

14   very unfortunate that you took this approach in this

15   case.  And then once she called you and told you

16   what had happened, the fact that the bank would only

17   give out your number and the fact that you didn't

18   remedy the situation or get with her and fix it, it

19   causes me even more concern.

20        I guess what I'm saying to you, looking at

21   what happened with Judge Toliver in a completely

22   different context, but yet she said the timing of

23   the service in that case was patently untimely,

24   unreasonable, and here we are in another situation

25   where this is unorthodox.  I have not seen this

1    happen before.  I just don't want to see it happen

2    again.

3             MR. MANTEUFFEL:  Yes, Your Honor.  I

4    appreciate the Court's position and I understand.

5             THE COURT:  As I understand it now, the

6    garnishment action is dissolved, I have granted the

7    motion to stay and there is nothing else to do with

8    regard to the bond in this case.

9             Do both sides agree with it?

10            MR. MANTEUFFEL:  As I understand it, the

11   bond itself bears the Court's signature and by

12   virtue of that the bond is, in fact, approved.

13            THE COURT:  I want to make sure we are all

14   in agreement that there is nothing more to be done.

15   I wanted to have you-all in here today to have this

16   conversation and to make sure I wasn't missing

17   something on these procedures or I was hearing it

18   straight from Ms. King-Mays as to what happened and

19   hearing it straight from you.

20            MS. KING-MAYS:  As far as we are

21   concerned, the bond issue is resolved with regard to

22   this matter.

23            THE COURT:  All right.

24            MR. MANTEUFFEL:  Yes, Your Honor.  What

25   normally would happen would be an order would be

1   entered by the Court approving the bond itself.  I

2   understand that the Court has signed the bond.

3   That's why we pulled down the garnishment when we

4   saw the bond.

5          THE COURT:  So there is nothing else to be

6   done on this.  Both sides agree.

7          MS. KING-MAYS:  No, Your Honor.

8          MR. MANTEUFFEL:  No, Your Honor.

9          THE COURT:  Let's just go forward.  And

10  I'm sure I will have more cases with you,

11  Mr. Manteuffel, and I'm sure I will have

12  Ms. King-Mays in here again.  We have been able to

13  operate in a way that seems to have moved along

14  relatively professionally.  I was a little concerned

15  about that last case, but I just don't want to see

16  anything like this happen again.

17         MR. MANTEUFFEL:  I understand, Judge.

18         THE COURT:  If there is nothing else, we

19  will be in recess.

20             (Court in recess at 10:36 a.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2              I, Shawnie Archuleta, CCR/CRR, certify

3    that the foregoing is a transcript from the record

4    of the proceedings in the foregoing entitled matter.

5              I further certify that the transcript fees

6    format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8              This 9TH day of July 2016.

9

10

11                        s/Shawnie Archuleta
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16   My CSR license expires:  December 31, 2016

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER – 214.753.2747**